# UNITED STATES DISTRICT COURT

for the

Southern District of Iowa

Central Division

| | |
|---|---|
| **Jenna James**<br>Plaintiff(s)<br>*(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | Case No. ____________<br>*(to be filled in by the Clerk's Office)* |
| **National Collegiate Athletic Association**<br>Defendant(s)<br>*(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | |

RECEIVED
AUG 1 8 2026
CLERK OF DISTRICT COURT
SOUTHERN DISTRICT OF IOWA

## COMPLAINT AND REQUEST FOR INJUNCTION

## I. The Parties to This Complaint

### A. The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Jenna James |
| Street Address | 102 225 Veterans Drive |
| City and County | Brampton |
| State and Zip Code | Canada |
| Telephone Number | 405 868 3784 |
| E-mail Address | jennabeyjames@gmail.com |

### B. The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Defendant No. 1

| | |
|---|---|
| Name | National Collegiate Athletic Association |

| | |
|---|---|
| Job or Title *(if known)* | |
| Street Address | 700 West Washington Street |
| City and County | Indianapolis |
| State and Zip Code | Indiana 46204 |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 2

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 3

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

Defendant No. 4

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

## II. Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power). Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties. Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case. Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case. In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction? *(check all that apply)*

☒ Federal question ☐ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

**A. If the Basis for Jurisdiction Is a Federal Question**

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

15 U.S.C. § 1 (Sherman Act); 15 U.S.C. § 26 (Clayton Act); 28 U.S.C. §§ 2201-2202 (Declaratory Judgment Act).

**B. If the Basis for Jurisdiction Is Diversity of Citizenship**

1. The Plaintiff(s)

a. If the plaintiff is an individual

The plaintiff *(name)* __________ is a citizen of the State of *(name)* __________

b. If the plaintiff is a corporation

The plaintiff *(name)* __________ is incorporated under the laws of the State of *(name)* __________ and has its principal place of business in the State of *(name)* __________

*(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2. The Defendant(s)

a. If the defendant is an individual

The defendant *(name)* __________ is a citizen of the State of *(name)* __________ Or is a citizen of *(foreign nation)* __________

b. If the defendant is a corporation

The defendant *(name)* __________ is incorporated under the laws of the State of *(name)* __________ and has its principal place of business in the State of *(name)* __________ Or is incorporated under the laws of *(foreign nation)* __________ and has its principal place of business in *(name)* __________

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3. The Amount in Controversy

The amount in controversy-the amount the plaintiff claims the defendant owes or the amount at stake-is more than $75,000, not counting interest and costs of court, because *(explain)*:

## III. Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the injunction or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A. Where did the events giving rise to your claim(s) occur?

Ames, Story County, Iowa, where Plaintiff most recently competed for and graduated from Iowa State University and where NCAA eligibility rules were applied to her; Indianapolis, Indiana, where the NCAA is headquartered; and through the NCAA's nationwide Division I eligibility and Transfer Portal system.

B. What date and approximate time did the events giving rise to your claim(s) occur?

Key events occurred on June 23, 2026, when the NCAA adopted the new Division I five-year eligibility model; July 31, 2026, when Wisne v. NCAA granted preliminary relief to a 2022-23 cohort; and August 5, 2026, when Iowa State compliance told Plaintiff she was considered part of the 2021-22 group and did not advise that the bar to another season had been removed. The challenged exclusion is continuing during Fall 2026 roster, admissions, financial-aid, and enrollment decisions. Specific times are unknown.

C. What are the facts underlying your claim(s)? *(For example: What happened to you? Who did what? Was anyone else involved? Who else saw what happened?)*

Plaintiff competed in four Division I indoor track-and-field seasons: 2022-23, 2023-24, 2024-25, and 2025-26. Her earlier Spring 2022 participation was outdoor track, which the NCAA rules then treated as a separate sport for seasons-of-competition purposes.
In June 2026, the NCAA adopted a model permitting up to five years of Division I participation, but its transition policy gives no additional eligibility to athletes who used a final season during 2025-26. Iowa State therefore continued to treat Plaintiff as ineligible for another season and, after Wisne, stated that she was considered part of the 2021-22 group rather than the 2022-23 class receiving relief.
The NCAA's eligibility and Transfer Portal rules prevent Plaintiff from entering the ordinary market in which willing Division I programs could recruit, sign, roster, or allow her to compete while she is treated as ineligible. Plaintiff seeks one additional indoor season in 2026-27, through the March 13, 2027 NCAA indoor championship date, subject to ordinary admissions, academic, roster, team-selection, and other neutral requirements. See attached Complaint for the complete factual allegations.

## IV. Irreparable Injury

Explain why monetary damages at a later time would not adequately compensate you for the injuries you sustained, are sustaining, or will sustain as a result of the events described above, or why such compensation could not be measured.

Money paid later cannot recreate a lost collegiate competition season. Division I programs are making roster, admissions, scholarship, and enrollment decisions now, while NCAA rules prevent Plaintiff from participating in the ordinary recruiting and Transfer Portal process as an eligible athlete.
The 2026-27 indoor season begins during the 2026 portion of the academic year and ends with the NCAA Indoor Championships on March 13, 2027. As time passes, roster spots and financial-aid opportunities can disappear. Once the season and championship dates pass, later damages cannot restore the lost chance to train with a team, compete, pursue championship participation, or obtain the associated athletic and educational opportunities.

## V. Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

Plaintiff requests declaratory and injunctive relief barring the NCAA from enforcing the challenged eligibility restraints to exclude her from the 2026-27 Division I indoor track-and-field season and requiring recognition of a usable eligibility period through March 13, 2027, including the narrow extension or tolling needed to complete that season.
If Plaintiff elects to transfer and provides written notification, she also requests immediate Transfer Portal access notwithstanding the ordinary notification window, so a willing Division I institution may recruit and consider her subject to neutral academic, admissions, roster, and team-selection rules. Plaintiff also requests taxable costs and other equitable relief. She does not presently seek money damages. See attached Complaint for the complete prayer for relief.

## VI. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: August 17, 2026

Signature of Plaintiff [signature]

Printed Name of Plaintiff Jenna James

**B. For Attorneys**

Date of signing: ____________

Signature of Attorney ____________
Printed Name of Attorney ____________
Bar Number ____________
Name of Law Firm ____________
Street Address ____________
State and Zip Code ____________
Telephone Number ____________
E-mail Address ____________

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

JENNA JAMES,
Plaintiff,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,
Defendant.

Case No. ____________________

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER SECTION 1 OF THE SHERMAN ACT**

## COMPLAINT

Plaintiff Jenna James ("Plaintiff"), proceeding pro se, alleges as follows based on personal knowledge as to her own acts and experiences and, as to all other matters, on information and belief after reasonable inquiry.

## INTRODUCTION

1. This is an action under Section 1 of the Sherman Act, 15 U.S.C. § 1, challenging the NCAA's agreement with its Division I member institutions to exclude Plaintiff from a fifth indoor track-and-field season during the 2026-27 academic year.

2. Plaintiff seeks the opportunity to offer her indoor track-and-field athlete services to willing Division I institutions during the 2026-27 indoor season, subject to ordinary admissions, enrollment, academic, roster, coaching, team-selection, and competition requirements.

3. This case is not principally about restoring Plaintiff's injury-affected Spring 2022 outdoor season. Plaintiff does not ask this Court to reverse the NCAA's denial of an outdoor-season waiver, and that denial did not cause the transition-rule injury alleged here.

4. Under the NCAA rules in force during Plaintiff's career, cross country, indoor track and field, and outdoor track and field were expressly treated as separate sports for seasons-of-competition purposes.

5. Plaintiff's outdoor history began in Spring 2022. Her indoor history began in the 2022-23 season, and she completed four indoor seasons: 2022-23, 2023-24, 2024-25, and 2025-26.

6. In June 2026, the NCAA adopted a new model that eliminates seasons-of-competition limits and sport-specific eligibility limitations and permits eligible Division I athletes up to five years of participation. But the transition policy provides no additional eligibility to athletes who used a final season under the former rules during 2025-26.

7. In Wisne v. NCAA, a federal district court preliminarily enjoined that transition exclusion for a class of athletes whose collegiate participation began in 2022-23 and who completed four seasons by the end of 2025-26. The preliminary ruling found those plaintiffs likely to succeed on their Section 1 claim; it is interlocutory, on appeal, and not a final adjudication binding this Court.

8. After Wisne, Iowa State compliance informed Plaintiff that it considered her part of the 2021-22 group because of her Spring 2022 outdoor participation and therefore did not understand the 2022-23 class relief to apply to her.

9. The Wisne class boundary does not create Plaintiff's ineligibility. It leaves the NCAA's preexisting transition exclusion in force against her. Plaintiff therefore brings this individual action for separate relief.

10. For indoor track, Plaintiff occupies the irrational adjacent gap. Her first indoor season was 2022-23, the same starting season central to Wisne, but the NCAA's transition framework uses her earlier participation in a different sport, outdoor track, to leave her excluded from a fifth indoor season.

11. The NCAA's current five-year period also begins with the regular academic term of first full-time enrollment, not the date of first competition. Plaintiff does not contend that her period began in March rather than January 2022. On the NCAA's apparent application, the period would expire during January 2027, in the middle of the 2026-27 indoor season.

12. The 2027 NCAA Division I Indoor Track and Field Championships are scheduled for March 12-13, 2027. Plaintiff requests only the narrow extension or tolling needed to remain eligible

through March 13, 2027, so that removal of the transition exclusion would produce one usable fifth indoor season.

13. Plaintiff seeks declaratory and injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26.

## PARTIES

14. Plaintiff Jenna James is a former Division I women's track-and-field athlete who competed for the University of Oklahoma and Iowa State University. She seeks a fifth indoor season, not guaranteed placement at any institution.

15. Plaintiff competed, studied, and graduated in Iowa while attending Iowa State during the 2025-26 academic year. Her most recent NCAA competition was for Iowa State, including at the 2026 NCAA Division I Indoor Track and Field Championships.

16. Defendant National Collegiate Athletic Association is a private, voluntary, unincorporated association of colleges, universities, and athletic conferences. Its national office and principal headquarters are at 700 West Washington Street, Indianapolis, Indiana 46204.

17. The NCAA and its Division I member institutions collectively adopt, administer, interpret, and enforce the eligibility rules challenged in this action. Iowa State University is an NCAA Division I member located in Ames, Story County, Iowa.

## FEDERAL SUBJECT-MATTER JURISDICTION

18. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiff's claim arises under Section 1 of the Sherman Act, 15 U.S.C. § 1.

19. This Court also has jurisdiction under 28 U.S.C. § 1337(a) because this action arises under an Act of Congress regulating commerce and protecting trade and commerce against restraints and monopolies.

20. Section 16 of the Clayton Act, 15 U.S.C. § 26, authorizes private injunctive relief against threatened loss or damage from a violation of the federal antitrust laws.

21. The Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, authorizes declaratory and further necessary or proper relief in this actual controversy.

22. The challenged agreement and its enforcement substantially affect interstate commerce. Division I recruiting, competition, travel, broadcasts, sponsorships, tuition, financial aid, name-image-and-likeness activity, and the movement of athlete services occur across state lines.

## PERSONAL JURISDICTION OVER THE NCAA IN IOWA

23. This Court may exercise personal jurisdiction under Federal Rule of Civil Procedure 4(k)(1)(A) and Iowa Rule of Civil Procedure 1.306, which permits jurisdiction to the full extent allowed by the United States Constitution.

24. The NCAA purposefully directs continuing regulatory and commercial activity into Iowa through Iowa member institutions, conferences, compliance systems, personnel, athletes, events, contracts, and enforcement mechanisms.

25. The NCAA requires Iowa State and other Iowa members to certify athletes under NCAA rules and to withhold athletes whom NCAA rules render ineligible. An Iowa member cannot disregard the transition exclusion and independently offer NCAA Division I competition to Plaintiff without risking NCAA consequences.

26. While Plaintiff was competing and studying at Iowa State, Iowa State submitted an eligibility waiver request from Iowa to the NCAA concerning Plaintiff's continued track-and-field participation. The NCAA adjudicated that request and communicated its denial to Iowa State for implementation in Iowa.

27. The challenged transition exclusion likewise operates in Iowa through Iowa State's NCAA-mandated certification obligations.

28. Plaintiff graduated from Iowa State in Spring 2026 and is not currently enrolled at Iowa State or at another Iowa institution. Plaintiff is presently outside Iowa while awaiting employment

authorization through Optional Practical Training (OPT), which she pursued only because she had been a student and cannot lawfully work in the United States without that authorization. Her present absence from Iowa is therefore not evidence that Iowa lacks a continuing connection to the dispute. But for the NCAA's transition and eligibility rules barring her from another season, Plaintiff would have remained in Iowa as a returning Iowa State athlete; she would not now be required to contemplate a transfer merely to obtain an opportunity that Iowa State's program would otherwise have considered as part of its returning-athlete group. If Iowa State lacks roster capacity, Plaintiff may use the requested relief at a different willing Division I institution that has not yet been determined.

29. Regardless of whether the Iowa State track and field program elected not to bring Plaintiff back for another year, the choice has effectively been removed because the NCAA's collective rules prevent Iowa State and other buyers of athletic services from accepting her services.

30. Even so, the NCAA continues to direct Plaintiff-specific compliance activity into Iowa. Iowa State is the member institution for which Plaintiff most recently competed. Under the NCAA's nationally uniform system, Iowa State compliance must apply NCAA eligibility and Transfer Portal rules if Plaintiff seeks eligibility confirmation, asks to return for postbaccalaureate participation, or gives written notification of transfer. Those present obligations determine whether Plaintiff can be considered by Iowa State or made available to another institution. Plaintiff's temporary absence from Iowa does not sever that connection because she would be in Iowa now, continuing as an Iowa State athlete, but for the challenged eligibility bar.

31. After Wisne, Plaintiff asked Iowa State whether the class relief changed that status. Iowa State's response did not constitute a new discretionary eligibility determination under an Iowa State rule. Compliance stated that Plaintiff was considered part of the 2021-22 group and that it was 'not sure' whether Wisne was applicable to her. The response did not identify any

alternative NCAA pathway by which she could be treated as eligible. No further communication from Iowa State compliance has notified Plaintiff that the NCAA transition exclusion no longer bars her from competition.

32. Plaintiff's claim arises out of or relates to the NCAA's purposeful administration and enforcement of her eligibility through its Iowa member. The disputed restraint now prevents Plaintiff from continuing her Division I career after her most recent season at Iowa State, would bind Iowa State or any other Iowa member institution considering her for future participation, and has produced recruiting and participation effects through the NCAA's eligibility system in Iowa.

33. Exercising jurisdiction is fair because the NCAA deliberately governs eligibility at Iowa member institutions and has already adjudicated Plaintiff-specific eligibility materials submitted by an Iowa member for an athlete then competing in Iowa.

34. If the NCAA disputes the jurisdictional facts alleged above, Plaintiff requests limited jurisdictional discovery before dismissal concerning the NCAA's eligibility and waiver communications with Iowa State regarding Plaintiff, the NCAA rules, guidance, and compliance systems governing Iowa State's consideration of Plaintiff's eligibility, and the implementation of the challenged transition rule through NCAA member institutions in Iowa.

**VENUE IN THE SOUTHERN DISTRICT OF IOWA**

35. Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions connected to this dispute occurred in this District.

36. Iowa State is located in Ames, Story County, Iowa, within the Central Division of the Southern District of Iowa.

37. In this District, Iowa State submitted Plaintiff's waiver materials, received and relayed the NCAA's decision, administered NCAA eligibility requirements, and responded to Plaintiff's

inquiry about whether Wisne removed the continuing bar. Plaintiff also trained, competed, studied, graduated, and experienced the loss of eligibility while connected to Iowa State.

38. Venue is also proper under 28 U.S.C. §§ 1391(b)(1) and 1391(c)(2) to the extent the NCAA is deemed to reside in this District because it is subject to personal jurisdiction here with respect to this action.

## ALTERNATIVE REQUEST FOR TRANSFER TO THE SOUTHERN DISTRICT OF INDIANA

39. Transfer would preserve a time-sensitive federal claim, avoid duplicative filing expense and delay, and permit adjudication in a district where the NCAA cannot reasonably dispute that it is at home. Plaintiff therefore affirmatively requests immediate transfer of this entire action, including any pending request for emergency relief, to the Southern District of Indiana rather than dismissal if this Court finds a jurisdictional or venue defect. Plaintiff is prepared to comply promptly with that court's local filing and service requirements.

40. Plaintiff pleads this transfer request in the alternative and does not concede that jurisdiction or venue is lacking in Iowa.

41. If this Court concludes that personal jurisdiction or venue is absent or materially doubtful, the interests of justice favor transfer rather than dismissal under 28 U.S.C. §§ 1404(a), 1406(a), and, to the extent applicable, 1631.

42. The appropriate fallback forum is the United States District Court for the Southern District of Indiana, Indianapolis Division, where the NCAA maintains its headquarters and adopted, administered, or enforced the challenged transition policy.

## DETAILED FACTUAL CHRONOLOGY

43. University of Oklahoma classes for the Spring 2022 semester began on January 18, 2022. Plaintiff was scheduled to begin her collegiate studies during that term, but circumstances outside her control delayed completion of her F-1 student-visa process, and she did not enter the United States until February 9, 2022, more than three weeks after classes began.

44. Given Plaintiff's delayed arrival, the timing of the indoor competition calendar, and COVID-era disruption, it was not realistic for her to join and complete the 2021-22 indoor season. She did not compete in indoor track during Spring 2022.

45. Plaintiff's first recorded NCAA competition occurred on March 18-19, 2022, at the TCU Invitational, where she competed in the 400-meter hurdles. That was outdoor track and field.

46. Plaintiff suffered a broken bone during the 2022 outdoor season. She continued competing after the injury under pressure from coaching personnel, and her recorded outdoor participation extended into May 2022

47. Plaintiff did not receive a redshirt season, an eligibility-clock extension, or a season-restoration waiver for the 2022 outdoor season.

48. Plaintiff competed in four outdoor seasons: Spring 2022, Spring 2023, Spring 2024, and Spring 2025.

49. Plaintiff separately competed in four indoor seasons: 2022-23, 2023-24, 2024-25, and 2025-26.

50. The NCAA rules then in force treated indoor and outdoor track as separate sports for seasons-of-competition purposes. Plaintiff's Spring 2022 outdoor participation therefore was not an indoor season, and her first indoor season remained 2022-23.

51. In Fall 2025, Plaintiff transferred from the University of Oklahoma to Iowa State University.

52. Plaintiff's first recorded competition for Iowa State occurred on December 12, 2025, during the 2025-26 indoor season.

53. On March 13-14, 2026, Plaintiff competed at the NCAA Division I Indoor Track and Field Championships. Her distance medley relay team placed third.

54. Plaintiff is a proven impact athlete within Division I. She has individually qualified for the NCAA Championships in the 400-meter hurdles, earned NCAA All-America honors, competed internationally representing Canada, and scored points at Big 12 conference

championship meets. Her third-place relay finish at the 2026 indoor championships further demonstrates that she can contribute at the national level.

55. Plaintiff graduated from Iowa State in Spring 2026. She subsequently left Iowa because she is awaiting employment authorization through Optional Practical Training (OPT), which is a post-student work authorization she would not have needed to pursue had she not been a student. Because she cannot lawfully work in the United States without the required authorization, she could not remain in Iowa simply for employment purposes while waiting for OPT. Her present location is therefore a consequence of her post-graduation immigration and employment-authority circumstances, not an indication that she has abandoned the Iowa State athletic opportunity. If the NCAA's transition/5-for-5 rule did not bar her from eligibility, Plaintiff would still be an Iowa State athlete and would have remained in Iowa as a producing returning member of the program rather than contemplating a transfer.

56. Plaintiff completed high school in 2021 and began NCAA competition at age eighteen. She has competed continuously during the ordinary post-high-school period and will remain twenty-three through March 13, 2027. She is not a mature first-time entrant returning after an extended professional or noncollegiate career.

57. When Plaintiff was permissibly listed in the NCAA Transfer Portal in June 2025, at least thirteen Division I programs contacted her within approximately two days, including one that stated an athletics scholarship was available. Those contemporaneous communications show actual buyer demand for her services when NCAA rules allowed member schools to recruit her.

58. That demand carried concrete economic value. Plaintiff's University of Oklahoma aid record identifies track-specific awards and benefits of up to $178,823, and her Iowa State University 2025-26 financial-aid statement reflects $50,549 in total aid. The challenged restraint

forecloses competition for a package that includes financial aid, education, coaching, facilities, medical and academic support, NIL opportunities, and championship exposure.

59. Plaintiff graduated from Iowa State in Spring 2026.

60. During Spring 2026, Iowa State submitted a request to the NCAA to restore an outdoor season based on the broken-bone circumstances from Plaintiff's first outdoor season.

61. On April 21, 2026, Iowa State notified Plaintiff that the NCAA had denied the request. On April 22, Iowa State compliance relayed that the principal reason given was Plaintiff's continued participation well into the second half of the 2022 outdoor season after the injury.

62. Plaintiff does not challenge that waiver denial in this action or allege that it caused her present ineligibility under the transition policy.

63. Even if the NCAA had granted the waiver and Plaintiff had competed in Spring 2026 outdoor track, she still would have used a final season during the 2025-26 academic year and would remain within the transition policy's exhausted-athlete category. Her 2025-26 indoor season independently produced that result.

64. On May 4, 2026, Coach A sent a message in the '25/26 Crew' group visible to the whole team. The coach stated that redshirting had been 'dissolved for those athletes who were not going to graduate this year,' and referred to 'a new 5 for 5 ruling' that could be explained later. Plaintiff retained a contemporaneous redacted screenshot of the message.

65. Plaintiff reasonably understood the coaching staff's teamwide explanation to mean that the eligibility change then being discussed did not include athletes graduating in Spring 2026, including Plaintiff, and that her exhausted status remained unchanged. That understanding was later reinforced by NCAA transition guidance and Iowa State's treatment of Plaintiff as excluded.

66. On June 23, 2026, the NCAA adopted its new Division I age-based eligibility model, effective in relevant part on August 1, 2026.

67. The NCAA publicly explained that the model permits up to five years of eligibility for athletes who satisfy the enrollment and age rules, and that it eliminates season-of-competition limits, sport-specific eligibility, redshirt rules, and eligibility-extension waivers.

68. The NCAA's transition guidance divides athletes according to their status after 2025-26. Athletes with eligibility remaining receive the more favorable result under the former or new rules; athletes who used their final season during 2025-26 receive no additional eligibility.

69. Because Plaintiff completed her fourth indoor season in 2025-26, she and Iowa State understood before Wisne that the NCAA transition policy treated her eligibility as exhausted. Iowa State did not have independent discretion to ignore the NCAA policy and certify her for another NCAA season.

70. On July 31, 2026, the United States District Court for the District of Colorado granted preliminary relief and certified an injunctive class in Wisne v. NCAA.

71. After Wisne, Plaintiff asked Iowa State whether the order changed her status. On August 5, 2026, Iowa State compliance responded: 'You are considered in the class of 2021-22. Case only applicable to 2022-23 class. At this point, not sure applicable to you.' This was the only compliance response Plaintiff received addressing Wisne's applicability to her, and no later communication from compliance advised that the exclusion had been removed or that Plaintiff had been determined eligible.

72. Iowa State's response was based on its understanding of Wisne's class definition.

73. Plaintiff did not request entry in the NCAA Transfer Portal because the teamwide coaching communication, NCAA transition guidance, and Iowa State's treatment all indicated that her NCAA eligibility would end after 2025-26. Portal entry would have been practically futile for securing a usable Division I opportunity and potentially misleading because Portal entry signals availability to other schools while Plaintiff was being told she had no remaining eligibility. Iowa State did not deny a Portal request, and no prior denial is alleged; the

ordinary notification window closed while Plaintiff was treated as ineligible. Plaintiff now seeks immediate, as-applied Portal access if she elects to transfer so that an eligibility injunction remains usable if Iowa State lacks roster capacity. The absence of a new formal NCAA determination after Spring 2026 does not make the controversy speculative: the operative transition rule and the NCAA's treatment of Plaintiff already communicate the result that matters - that her final 2025-26 season leaves her without another season under the challenged transition framework. Seeking a second formal statement of the same rule would not create a different injury or provide a meaningful alternative path to eligibility.

74. Under NCAA rules, other Division I programs may not engage in formal recruiting contact with Plaintiff unless she is permissibly entered in the Portal, and NCAA recruiting guidance states that four-year transfers must be permissibly entered in the NCAA Transfer Portal to sign a written offer of athletics aid. The NCAA therefore controls the ordinary process through which Plaintiff could identify and document willing institutions. It cannot first enforce an eligibility bar that made Portal entry futile or misleading and then treat the absence of Portal-generated recruiting evidence as proof that her injury is speculative. Because Plaintiff is not lawfully positioned to solicit or accept an athletics scholarship elsewhere while the NCAA treats her as ineligible, she cannot reasonably be expected to manufacture competing institutional offers outside the NCAA process.

75. In February-April 2026, the NCAA publicly identified a compliance problem involving schools acquiring transfer athletes outside the prescribed Portal process. On April 1, 2026, the Division I Cabinet adopted automatic penalties for a program that signs a transfer, adds a transfer to its roster, or allows a transfer to participate in athletically related activities before Portal entry: suspension of the sport's head coach for 50% of a season and a fine equal to 20% of that sport's budget. On April 15, the NCAA finalized the process and described the underlying conduct as schools 'circumventing transfer rules.' The penalties apply across

Division I sports. See NCAA, DI Cabinet Adopts New Rules to Address 'Ghost Transfers' for All Sports (Apr. 1, 2026); NCAA, DI Cabinet Finalizes Process for Ghost Transfer Violations (Apr. 15, 2026).

76. Plaintiff does not ask this Court to interpret, enforce, expand, or modify the Wisne preliminary injunction. The court-defined class boundary simply leaves the NCAA's underlying national restraint in place against Plaintiff, and she brings this individual action so that her own antitrust claim and request for separate relief may be adjudicated. If another court later determines that Plaintiff is a Wisne class member with respect to indoor track, any overlapping relief can be addressed through ordinary judicial coordination.

77. On August 3, 2026, while Plaintiff was seeking information about possible roster availability, an Iowa State coach stated that a relevant roster had some space, though not much. The message is not alleged to be a formal offer or roster promise. It is evidence that a limited but real opportunity may exist and disappear with delay.

78. Plaintiff acted diligently. Wisne was decided on July 31, 2026; Plaintiff promptly investigated whether it changed her status, communicated about roster capacity on August 3, received Iowa State's response on August 5, and began preparing this action without material delay while 2026-27 roster and enrollment decisions were underway.

79. Schools cannot and will not commit a roster spot to a transfer whose NCAA eligibility is unresolved. Institutional roster-building and transfer-intake decisions are made on fixed internal timelines tied to confirmed eligibility, financial-aid allocation, and squad-size limits, and no compliance office will finalize a spot contingent on litigation Plaintiff has not yet filed. Plaintiff has not attempted to enroll elsewhere because she does not have the financial means to attend a United States institution absent an athletic scholarship. She also cannot identify the institutions that would be interested in her because the NCAA's own eligibility rule prevents those institutions from lawfully recruiting her and prevents her from entering

the ordinary market for those opportunities. The absence of identified institutions therefore results from the challenged restraint and Plaintiff's inability to self-fund enrollment, rather than from a lack of redressable demand. The contemporaneous market evidence Plaintiff can presently produce is concentrated in 2025 for the same reason: the NCAA's rule foreclosed the later recruiting process through which comparable 2026 opportunities would otherwise have been generated.

80. Plaintiff is aware of multiple Division I coaches who have expressed interest in recruiting Plaintiff Plaintiff if she is determined eligible and permitted to participate in the ordinary Transfer Portal process. Plaintiff has not sought or obtained formal recruiting offers because doing so while she is treated as ineligible could implicate NCAA recruiting restrictions.

81. Iowa State's Fall 2026 semester begins on August 24, 2026. Division I programs are allocating admissions, roster, financial-aid, training, and competition resources for the 2026-27 academic year now.

82. Plaintiff wants to compete in one additional indoor track-and-field season during 2026-27 and is seeking the opportunity to satisfy the academic, admissions, enrollment, and roster requirements of a willing Division I institution. Plaintiff does not claim that any institution must admit, enroll, recruit, roster, provide financial aid or compensation, or select her. The requested relief would instead remove the NCAA restraints so that a willing institution can make that decision for itself. Plaintiff cannot currently identify the institution that would ultimately enroll her because the same NCAA rules she challenges prevent institutions from lawfully considering her in the ordinary recruiting process.

83. The 2026-27 indoor season spans two academic terms. Indoor training and competition begin during the 2026 portion of the academic year, continue after the winter break, and culminate in championships during March 2027.

84. The NCAA Division I Indoor Track and Field Championships are scheduled for March 12-13, 2027, at the Randal Tyson Center in Fayetteville, Arkansas.

85. Under current Bylaw 12.6, Plaintiff's five-year period began with her regular academic term of first full-time enrollment in Spring 2022. Plaintiff does not base her claim on moving that start date from January to her first competition in March. The claim instead recognizes two separate practical restraints that must both be addressed for relief to be meaningful: the transition exclusion treats Plaintiff's fourth 2025-26 indoor season as final, while the five-year clock as applied is set to expire during January 2027. Enjoining only one of those restraints would leave the other in place and would not provide a usable fifth indoor season.

86. On the NCAA's apparent application, Plaintiff's five-year period would expire during January 2027. A fifth indoor season would therefore be cut off in the middle, before conference and NCAA championships and before the ordinary conclusion of the sport's season. Accordingly, Plaintiff seeks relief from both the transition exclusion that treats her fourth 2025-26 indoor season as final and the January 2027 expiration of the continuous five-year clock, together with only the narrow no-waiver relief necessary to make the requested season usable through March 13, 2027.

87. A similarly situated athlete who first enrolled in Fall 2022 and began indoor track in 2022-23 ordinarily has a five-year period extending through the complete 2026-27 indoor season. Plaintiff began indoor track in the same season but loses the championship portion solely because her full-time enrollment began one term earlier.

88. The NCAA describes the new model as permitting up to five years, not as guaranteeing five seasons. Plaintiff does not allege a formal promise of five seasons. She alleges that, in the practical structure of indoor track, the combined transition exclusion and midseason clock cutoff deny her the same usable fifth-year opportunity the NCAA permits for ordinarily timed Fall 2022 entrants.

89. A narrow extension through March 13, 2027 would bridge only the remainder of one already-defined indoor season. It would not authorize outdoor participation after that date, create unlimited eligibility, or displace ordinary institutional and sport rules.

90. Absent relief, the NCAA's categorical bar prevents member institutions from considering Plaintiff as an eligible athlete even if a coach and school otherwise have academic and roster capacity. Delay will progressively eliminate the possibility of meaningful relief.

91. Plaintiff previously satisfied NCAA initial-eligibility requirements and competed for two Division I institutions. On information currently available to Plaintiff, no separate categorical NCAA bylaw has been identified that would independently bar her from 2026-27 participation if the challenged Eligibility Restraints are enjoined. Plaintiff is prepared to enroll in a qualifying postgraduate or other eligible academic program and satisfy neutral admissions, enrollment, academic-progress, transfer-eligibility, roster, and team-selection requirements. Those requirements remain in force, but they do not make the requested relief nonredressable.

**NCAA RULES AND POLICIES CHALLENGED**

92. Under the former Division I framework, a student-athlete generally had four seasons of competition to use within a five-year period, subject to specified exceptions and waivers.

93. For seasons-of-competition purposes, former Bylaw 12.8.3.3 stated: 'Cross country, indoor track and field, and outdoor track and field shall be considered separate sports.' NCAA Division I Manual, Bylaw 12.8.3.3 (2021-22). The rule was later renumbered, without altering the relevant separation principle.

94. Current Bylaw 12.6 provides that an individual's eligibility period is limited to five years and begins with the earlier of the regular academic term of first full-time collegiate enrollment and class attendance or the age-based trigger stated in the rule. NCAA Division I Manual, Bylaw 12.6 (2026-27).

95. Plaintiff does not challenge the age-based trigger and assumes that the full-time-enrollment clause controls her start date.

96. The 2026 model eliminates the former limit on seasons of competition and eliminates sport-specific eligibility limitations during the applicable five-year period.

97. The NCAA's transition policy nevertheless provides no additional eligibility to athletes who used their final season under the former rules during 2025-26, while athletes with eligibility remaining may receive whichever framework is more favorable.

98. Current Bylaw 12.6.8 further states that there shall be no waivers of the five-year-period legislation. As applied here, that categorical rule prevents a school or NCAA administrator from supplying the short extension necessary to complete the indoor season after a January 2027 cutoff.

99. Plaintiff refers to the following related restraints as the 'Eligibility Restraints': (a) the 2026 transition exclusion for athletes who used a final season during 2025-26; (b) Bylaw 12.6's five-year period as applied to cut off Plaintiff's fifth indoor season during January 2027; (c) Bylaw 12.6.8's categorical no-waiver provision; and (d) related NCAA agreements and enforcement practices that require member institutions to treat Plaintiff as ineligible. For purposes of the rule-of-reason analysis, however, Plaintiff does not rely on the label 'Eligibility Restraints' to collapse these distinct restraints into one. The transition exclusion and the five-year clock independently foreclose different portions of the same competitive opportunity and each must be evaluated for its own anticompetitive effect, procompetitive justification, and substantially less restrictive alternatives. The no-waiver provision is challenged only insofar as it prevents the narrow relief necessary to remedy the separate clock cutoff.

100. Plaintiff does not challenge the former four-seasons framework as such; she challenges only its use, through the transition exclusion defined above, to deny her the fifth-year opportunity the 2026 model otherwise provides.

101. Eligibility and Transfer Portal rules operate at different stages of the same proposed exchange. Eligibility rules determine whether an athlete may lawfully supply, and a Division I institution may use, another season of athletic services. Transfer rules determine whether an otherwise eligible four-year transfer may enter the NCAA's prescribed recruiting mechanism and become available to competing Division I buyers. Plaintiff seeks narrow, as-applied relief from the notification-of-transfer window and related NCAA Transfer Portal restrictions only to make any eligibility injunction effective; she does not seek to invalidate transfer windows generally.

102. If Plaintiff elects to transfer and provides written notification, the requested relief would require the NCAA to authorize and take all steps within its control to permit immediate Portal entry and would prohibit the NCAA from penalizing Plaintiff or a willing institution for recruitment, transfer, signing, rostering, or participation undertaken in reliance on that entry and the eligibility injunction. All other neutral transfer-eligibility, academic, admissions, roster, and team-selection requirements would remain in force.

**WISNE AS A PERSUASIVE COMPARATOR**

103. On July 31, 2026, the United States District Court for the District of Colorado granted preliminary injunctive relief and certified an injunctive class in Wisne v. NCAA, No. 1:26-cv-03063-CNS-KAS. See ECF Nos. 37-38 (D. Colo. July 31, 2026), clarified, ECF No. 41 (Aug. 2, 2026), appeal docketed, No. 26-1309 (10th Cir. Aug. 3, 2026).

104. Wisne preliminarily found that the class plaintiffs were likely to succeed on the merits of their Section 1 challenge to implementation of the Five-Year Eligibility Rule. The court also found irreparable harm and granted classwide preliminary relief.

105. The Wisne court later clarified that its injunction concerns only a fifth season and does not enjoin transfer rules, House settlement provisions, roster limits, or other rules not identified in the relief.

106. That distinction matters here. If eligibility is judicially restored after the ordinary transfer process has closed, the legal supply of an athlete's services may be restored while access to the mechanism through which competing Division I institutions recruit those services remains blocked. Plaintiff therefore requests separate Portal relief only as necessary to make any eligibility injunction usable.

107. Wisne is persuasive because it identifies the same competitive injury produced by the same transition exclusion: qualified Division I athletes are removed from the athlete-services market after four seasons while the NCAA simultaneously authorizes a five-year model for others.

108. Plaintiff's indoor history presents the closest adjacent application. She began indoor track in 2022-23 and completed four indoor seasons by 2025-26, just as a Wisne class member who participated only in that sport and timeframe would have done.

109. Under the former rules, Plaintiff's Spring 2022 outdoor participation was a season in a separate sport. The NCAA counted her indoor and outdoor seasons separately while the former framework operated.

110. Yet the NCAA's transition exclusion remains applicable to Plaintiff because that different outdoor sport began in 2021-22 and prevents her from being treated as part of the 2022-23 starting cohort for present class relief.

111. The NCAA cannot justify the resulting market exclusion merely by pointing to the existence of a court-drawn class boundary. The relevant restraint is the NCAA policy that the preliminary injunction has not removed as to Plaintiff.

112. Applying the phrase 'began to play in collegiate sports' across all sports creates an arbitrary gap precisely because the NCAA itself treated indoor and outdoor track as separate sports when counting Plaintiff's seasons. Plaintiff's first indoor season was 2022-23; the NCAA should not rely on the former sport-by-sport separation to count four indoor seasons and then disregard that separation when deciding who receives transition relief.

## RELEVANT ANTITRUST MARKET

113. The relevant market is the nationwide buyer-side labor market for NCAA Division I women's track-and-field athlete services. Division I member institutions are competing purchasers of those services, and athletes such as Plaintiff are sellers. The indoor season is a distinct competitive segment of that market.

114. The market involves a reciprocal commercial exchange. Division I institutions obtain athlete services including training, competition, event and relay performance, team scoring, and associated promotional value. Athletes compete for roster positions and receive in return some combination of athletics-based aid and other compensation, education, coaching, facilities, medical and academic support, NIL opportunities, and championship exposure. The challenged rules regulate whether that exchange may occur at all.

115. Under Eighth Circuit law, a market turns on reasonable interchangeability and, when a supplier is shut out from buyers, on the buyers to whom that supplier can practicably sell. See Little Rock Cardiology Clinic, P.A. v. Baptist Health, 591 F.3d 591, 597-98 (8th Cir. 2009); Double D Spotting Serv., Inc. v. Supervalu, Inc., 136 F.3d 554, 560 (8th Cir. 1998). Division II, Division III, NAIA, NJCAA, and professional track are the principal alternative outlets and are addressed expressly below.

116. The athlete services purchased by Division I women's track programs are not interchangeable with ordinary student labor, nonathletes, or athletes in unrelated sports. NCAA Division I women's indoor track separately contests event groups including the 60 meters, 200 meters,

400 meters, 60-meter hurdles, and relays. A program seeking competitive sprint or hurdle production cannot satisfy that roster need with a person who does not perform those services at the required competitive level. Plaintiff's own history as a 400-meter hurdler and NCAA championship athlete, together with rapid recruiting contact from multiple Division I programs when she was Portal-available, illustrates this event-specific demand. See NCAA.com, 2026 Division I Indoor Track and Field Championship Results.

117. A Division I roster position supplies a distinct education-and-athletics bundle: athletics-based aid and other compensation, a degree, NCAA Division I academic and student-athlete protections, coaching and facilities, NIL opportunities, conference competition, and access to Division I championships. Division III does not award athletics scholarships; Division II generally uses an equivalency or partial-scholarship model and, as pleaded below, operates at materially different financial scale. NAIA and NJCAA institutions may provide athletics aid, and Plaintiff does not allege otherwise, but they are separate intercollegiate systems that cannot provide an NCAA Division I roster position, NCAA Division I competition, or NCAA Division I championship access. NJCAA is a junior-college system that itself describes transfer to four-year NCAA or NAIA institutions as a pathway after NJCAA competition. Professional track likewise does not provide the college education-and-support bundle or NCAA championship access. See NCAA, Division II Athletics Scholarship; NCAA, Division III Initial Eligibility Requirements; NAIA, Explore NAIA; NJCAA, Divisional Structure; NJCAA, Want to Be Part of the NJCAA Experience?

118. Current economic data confirms those functional differences. The NCAA's 2024 Membership Financial Dashboard reports median total athletics revenue ranging from $23.2 million to $149.3 million across Division I subdivisions, compared with $7.0 million to $9.2 million for Division II schools.

119. Track-specific data show the same divide. A review of public 2024 Equity in Athletics Disclosure Act data for 52 Division I and 33 Division II women's track programs shows median operating expense of $5,718 per participant and $658,076 per team in Division I, versus $891 per participant and $108,903 per team in Division II. Those current, sport-specific differences make lower-division opportunities economically and competitively inadequate substitutes for Plaintiff.

120. The market is substantial. The NCAA's 2025 participation dashboard reported 339 Division I women's indoor-track programs, 14,429 participants, and an average team size of 42.6. A September 2025 NCAA projection separately listed 349 Division I women's indoor-track teams and 355 outdoor-track teams.

121. The NCAA's own Division I Transfer Composition Dashboard confirms that experienced transfers are a measurable part of this market. For Women's CC/Track in academic year 2024, the dashboard reports 8,169 undergraduate nontransfers, 894 four-year transfers, 190 two-year transfers, 679 postgraduate nontransfers, and 340 graduate transfers. The three transfer categories therefore total 1,424 of 10,272 athletes represented in those categories, approximately 13.9%. In 2015, the corresponding transfer categories totaled 844 of 9,352 athletes, approximately 9.0%. The dashboard cautions that these figures describe academic-cohort composition and are not lifetime transfer rates. Their significance here is narrower: Division I women's track programs actually acquire experienced collegiate athlete services, and transfers constitute a measurable portion of the athlete population.

122. Plaintiff's own market experience corroborates the aggregate data via email communications. Her championship-level performances, including third place in the 2026 NCAA indoor distance medley relay, make that demand concrete rather than speculative. The absence of equally recent recruiting evidence is explained by the restraint itself: after 2025, Plaintiff was treated as ineligible, could not use the ordinary recruiting process to generate competing

offers, and lacked the financial means to enroll at a U.S. institution without an athletic scholarship.

123. The geographic market is national rather than confined to the state or region of any particular school. The NCAA describes itself as a nationwide association of more than 1,000 colleges and universities, and Division I transfer rules use the Transfer Portal and sport-specific windows to structure recruitment opportunities across the division. Athletes routinely move among institutions across state lines, and Plaintiff herself received interest from Division I programs in multiple regions when she was Portal-available. The relevant buyers available to a Division I women's track athlete therefore are not limited to Iowa, Oklahoma, or any local recruiting radius. See NCAA, About the NCAA; NCAA, Division I Council Approves Changes to Transfer Rules (Apr. 17, 2024).

124. Alternatively, the relevant product market is the nationwide market for Division I college-athlete services, within which women's track and indoor track are identifiable segments. Plaintiff's claim does not depend on treating indoor track as a freestanding market: indoor competition has its own calendar, events, qualifying standards, championship, and athlete demand, and NCAA rules formerly treated indoor and outdoor track as separate sports for season-of-competition purposes.

125. The NCAA and its Division I members possess collective market power because they control access to Division I rosters, championships, and the associated education-and-compensation bundle. No individual member can offer that product outside NCAA rules, and the nationwide network of member schools and championship competition cannot be replicated by a prospective rival or professional circuit.

126. The challenged eligibility agreement regulates labor-market participation and compensation and is commercial conduct subject to the Sherman Act. NCAA v. Alston, 594 U.S. 69, 88-96

(2021). It therefore must be tested under ordinary rule-of-reason principles, not categorical deference.

127. Ortega v. NCAA, No. 4:25-cv-00496-RGE-SBJ, 2026 WL 1847877 (S.D. Iowa Apr. 23, 2026), denied preliminary relief on the record then presented; it did not dismiss an antitrust claim. Ortega recognized that the five-year rule is commercial and bars NCAA institutions from labor contracts with wrestlers they otherwise would seek to recruit, but found insufficient current economic analysis and credited an age-related product rationale as applied to a twenty-eight-year-old seeking his first NCAA competition after an extended noncollegiate interval.

128. This Complaint pleads current market evidence, and facts absent from that preliminary-injunction record. Plaintiff has documented aid and recruiting demand and seeks only to finish the 2026-27 indoor season through March 13, 2027.

## CONCERTED ACTION AND COMPETITIVE HARM

129. The NCAA is an association of horizontal competitors. Through NCAA governance, its Division I member institutions agreed to adopt and enforce the five-year age-based rule and the transition rule that exclude Plaintiff from the 2026-27 indoor season.

130. Absent that agreement, each member school could independently decide whether Plaintiff's services, academic standing, athletic ability, age, and remaining indoor eligibility warranted a roster place, financial aid, NIL support, or other benefits. The rule replaces those independent purchasing decisions with a collective refusal to deal with an identified category of athletes.

131. The restraint causes direct anticompetitive effects. It eliminates willing sellers from the Division I labor market, prevents willing buyers from recruiting them, reduces athlete mobility and buyer choice, and suppresses competition over aid, NIL opportunities, education, training, exposure, and other terms.

132. The effect on Plaintiff is not conjectural. NCAA rules now keep her out of the Portal and prevent member schools from lawfully competing for the same services notwithstanding her improved national-level performance.

133. Plaintiff has independently learned of interest from Division I programs outside the Transfer Portal process, conditioned on Plaintiff first becoming eligible to compete.

134. Plaintiff's individual facts fit that market mechanism. Plaintiff wants to supply one additional indoor season; multiple Division I coaches have expressed interest conditioned on eligibility and lawful Portal access; and NCAA rules presently prevent the ordinary recruiting process from determining whether a transaction can be completed. Her June 2025 Portal experience further shows that when NCAA rules made her services available, numerous Division I buyers competed for them. Plaintiff does not allege that any institution is guaranteed to offer a 2026-27 roster position.

135. The injury also extends beyond Plaintiff. Every otherwise-qualified athlete excluded by the transition rule loses access to competing Division I buyers, and every member institution loses the option to evaluate and contract with that athlete. That categorical reduction in labor-market choice is harm to the competitive process, not merely denial of an individualized waiver.

136. The market-wide foreclosure is not inferred from Plaintiff alone. The NCAA transfer-composition data show that Division I women's track programs actually acquire experienced collegiate athletes in measurable numbers. When a collective eligibility rule categorically declares an otherwise experienced athlete unavailable, no member institution may test demand by recruiting, rostering, or bargaining with that athlete. The restraint therefore forecloses potential buyer-seller transactions before the parties can compete over aid, roster position, NIL support, or other terms.

137. The NCAA's own response to 'ghost transfers' independently refutes the proposition that lack of Portal availability means lack of institutional demand. Schools have signed, rostered, or used transfer athletes before required Portal entry sufficiently to cause the NCAA to adopt automatic, severe sanctions across Division I. That conduct is revealed-preference evidence that at least some institutions demand athletes even when the prescribed transfer mechanism makes those athletes procedurally unavailable.

138. Plaintiff does not allege that the ghost-transfer legislation was adopted because of athletes excluded by the 2026 five-year transition or because of women's track. Its relevance is narrower. For the eligibility restraint, the additional inference comes from the women's-track market evidence: Division I women's track buyers demonstrably acquire experienced collegiate athlete services; NCAA eligibility rules determine which experienced athletes are legally available to those buyers; and a categorical eligibility exclusion therefore reduces the available supply and can foreclose transactions in a market that actually purchases that type of experience.

139. Defendant cannot plausibly presume that all relevant rosters are full. The NCAA's own 2025 data show an average Division I women's indoor team size of 42.6, below the 45-athlete limit applicable to House-settlement participating institutions, and Iowa State's coach advised Plaintiff that the roster had some space. These facts do not allege a vacancy at every institution; they refute a categorical zero-sum premise and make lost output at available programs plausible. The absence of a completed offer reflects the restraint, not the absence of demand: schools will not commit a roster spot to a transfer whose NCAA eligibility is unresolved, so open capacity cannot convert into a firm offer until the exclusion is lifted.

140. Even where a particular roster is full, the rule remains anticompetitive because it dictates which sellers a school may consider and prevents competition on price and quality for

available roster spots. A buyer's choice to recruit another athlete under a collectively imposed exclusion does not erase the excluded seller's labor-market injury.

141. These direct effects are reinforced by the NCAA's market power and the absence of reasonable substitutes. Plaintiff cannot obtain the same Division I bundle from Division II, Division III, professional track, or an unaffiliated provider, and she cannot bargain around the rule with any NCAA member.

142. The restraint is the but-for and proximate cause of Plaintiff's injury. If enforcement is enjoined through March 13, 2027, Plaintiff can enter the market and member schools can decide for themselves whether to recruit her, something no school can meaningfully do while her eligibility remains unresolved. Relief restores competition; it does not require any school to offer her a roster spot or aid.

143. The first restraint is the 2026 transition exclusion that treats Plaintiff's fourth 2025-26 indoor season as final. Its anticompetitive effect is direct: it removes an otherwise participating Division I athlete from a market in which member institutions could otherwise decide whether to purchase her services, thereby reducing buyer choice, athlete mobility, recruiting competition, and competition over aid, NIL opportunities, coaching, facilities, education, and championship exposure. The NCAA may contend that a transition cutoff is necessary to administer the change from the former four-season framework to the new five-year model, avoid disparate treatment, or preserve orderly administration. But as applied to Plaintiff, that rationale must be tied to this particular exclusion and this particular market effect; a transition rule cannot be justified merely by describing the need for a transition in the abstract.

144. Substantially less restrictive alternatives exist for the transition exclusion. The NCAA could create a one-time transition exception for athletes whose first indoor season was 2022-23 and whose fourth indoor season occurred in 2025-26; apply a sport-specific transition rule that recognizes indoor and outdoor track as separate sports, consistent with former Bylaw

12.8.3.3; or permit individualized review for continuously enrolled athletes who began immediately after high school and are seeking only the indoor portion of one academic year. Each alternative would preserve the NCAA's ability to administer the new model while permitting member schools to compete for services the transition exclusion otherwise removes from the market.

145. The second restraint is Bylaw 12.6's five-year clock as applied to expire Plaintiff's eligibility during January 2027, before the 2026-27 indoor season reaches its normal conference and NCAA championship conclusion. Its anticompetitive effect is independently significant: even if the transition exclusion were removed, the clock would still foreclose the latter portion of the season and prevent Division I buyers from competing for Plaintiff's services through the championship period. The NCAA may invoke administrative certainty, a uniform five-year eligibility period, or the avoidance of individualized clock extensions as justifications. Those interests must nevertheless be evaluated against the actual application here, involving a twenty-three-year-old athlete who entered NCAA competition at eighteen, has competed continuously, and seeks only to finish one indoor season already underway across the 2026-27 academic year.

146. Substantially less restrictive alternatives also exist for the five-year-clock restraint. The NCAA could toll or extend the clock only through March 13, 2027; create a one-time rule allowing athletes whose indoor season straddles the clock expiration to complete that season; or provide an individualized exception for athletes who began immediately after high school and seek only the championship conclusion of their final indoor season. These alternatives are narrow, administrable, and do not authorize outdoor participation after March 13, 2027, unlimited participation, or any guaranteed roster placement. The NCAA already uses transition rules, waivers in other contexts, and narrow portal exceptions, demonstrating that targeted administration is feasible.

147. Each restraint therefore requires its own rule-of-reason analysis. Bundling the transition exclusion, the January 2027 five-year clock cutoff, the no-waiver provision, and related enforcement mechanisms under the collective label 'Eligibility Restraints' does not eliminate the requirement to identify the anticompetitive effect of each restraint, the NCAA's specific justification for each, and a substantially less restrictive alternative for each. As applied to Plaintiff, the transition exclusion and the five-year clock independently cause competitive injury; the no-waiver provision compounds the clock injury by preventing the narrow extension needed to complete the season. Taken separately and together, the challenged restraints are more restrictive than reasonably necessary to achieve the NCAA's asserted goals while materially suppressing competition in the Division I athlete-services market.

**COUNT I - SHERMAN ACT SECTION 1**

148. Plaintiff incorporates the preceding paragraphs as though fully set forth here.

149. Section 1 of the Sherman Act prohibits agreements that unreasonably restrain trade. The NCAA and its Division I members are separate economic actors and horizontal competitors that agreed to adopt and enforce the challenged eligibility and transition rules.

150. The agreement restrains the nationwide Division I women's track-and-field labor market, or alternatively the nationwide Division I college-athlete labor market, by collectively excluding otherwise-qualified sellers and preventing member schools from competing to recruit and compensate them.

151. The NCAA possesses market power through its members' collective control of Division I rosters, aid, championship access, and the unique education-and-athletics bundle. Current NCAA and EADA data, Division I program scale, and the lack of reasonable substitutes independently make that power plausible.

152. The rule has actual and likely anticompetitive effects: reduced labor output where roster space exists; less buyer choice and athlete mobility; and suppressed competition over scholarships,

NIL opportunities, education, coaching, facilities, support, and exposure. NCAA transfer-composition data show that Division I women's track programs actually purchase experienced collegiate athlete services in measurable numbers. The NCAA's ghost-transfer enforcement further shows, for the narrower Portal issue, that procedural unavailability does not establish an absence of institutional demand. Plaintiff's documented recruiting interest and financial-aid history provide direct evidence of the commercial opportunity the challenged restraints foreclose as applied to her. The transition exclusion and the January 2027 clock cutoff each independently contribute to that foreclosure and must be analyzed separately even though they operate in sequence.

153. Plaintiff has antitrust injury because the restraint excludes her from the market in which she sells her athletic services and deprives her of the competitive process, economic benefits, and championship opportunities that would exist but for Defendants' agreement. Her injury is the type the antitrust laws protect against and flows directly from the challenged restraint.

154. The NCAA's asserted eligibility objectives do not justify either restraint as applied here. The transition exclusion could be replaced by the narrow transition alternatives pleaded above, and the January 2027 clock cutoff could be replaced by a limited tolling or completion rule through March 13, 2027. Those alternatives preserve the NCAA's ability to maintain a coherent eligibility system while allowing member schools to make independent purchasing decisions. As applied to a twenty-three-year-old continuous collegiate competitor seeking only to complete the indoor portion of an academic year, neither categorical restraint is reasonably necessary to preserve a collegiate product.

155. Defendants' agreement therefore unreasonably restrains trade in violation of 15 U.S.C. § 1. Plaintiff is entitled to declaratory and injunctive relief under 15 U.S.C. § 26 and all other relief allowed by law.

**PRAYER FOR RELIEF**

156. Declare that the NCAA's agreement to enforce the Eligibility Restraints against Plaintiff, insofar as it categorically bars her from a fifth indoor season during 2026-27, violates Section 1 of the Sherman Act;

157. Permanently enjoin the NCAA, its officers, agents, employees, and all persons acting in concert with it who receive actual notice from enforcing the Eligibility Restraints to bar Plaintiff from the 2026-27 Division I indoor track-and-field season;

158. Order the NCAA to recognize a usable eligibility window ending March 13, 2027, including (a) relief from the transition exclusion that treats Plaintiff's fourth 2025-26 indoor season as final and (b) the narrow extension or tolling of Bylaw 12.6 necessary to complete that indoor season, together with exclusion of litigation delay;

159. Order the NCAA to take the ministerial steps necessary to reflect Plaintiff's eligibility; if Plaintiff elects to transfer and provides written notification, to authorize and take all steps within its control to permit her immediate Transfer Portal entry notwithstanding the otherwise applicable notification window; and to notify Plaintiff and any requesting Division I institution that she is eligible for that indoor season and may be recruited and transferred for it, subject to neutral rules not challenged here;

160. Declare that, apart from the limited Transfer Portal and notification-window relief ordered above, the relief does not compel any institution to admit, enroll, recruit, roster, provide financial aid or compensation, or select Plaintiff;

161. Award Plaintiff her taxable costs to the extent allowed by law;

162. Retain jurisdiction to enforce the judgment and injunction; and

163. Grant such other and further equitable relief as the Court deems just and proper.

**JURY DEMAND**

164. Plaintiff presently seeks declaratory and injunctive relief only and therefore does not demand a jury. Plaintiff does not waive any jury right that may arise if a legal claim or remedy is later added or permitted.

**SIGNATURE**

Respectfully submitted,

**JENNA JAMES, Plaintiff pro se**

Signature: ______________________________

Date: ____Aug 17th 2026__________________________

Mailing Address: 102-225 Veterans Dr. Brampton ON Canada L7A 5L7

Phone Number: 405-868-3784

Email: jennabeyjames@gmail.com

JS 44 (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Jenna James

**(b)** County of Residence of First Listed Plaintiff: Canada
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Pro Se

## DEFENDANTS

National Collegiate Athletic Association

County of Residence of First Listed Defendant: U.S.
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

Unknown

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*

*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
- [ ] 110 Insurance
- [ ] 120 Marine
- [ ] 130 Miller Act
- [ ] 140 Negotiable Instrument
- [ ] 150 Recovery of Overpayment & Enforcement of Judgment
- [ ] 151 Medicare Act
- [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- [ ] 153 Recovery of Overpayment of Veteran's Benefits
- [ ] 160 Stockholders' Suits
- [ ] 190 Other Contract
- [ ] 195 Contract Product Liability
- [ ] 196 Franchise

**REAL PROPERTY**
- [ ] 210 Land Condemnation
- [ ] 220 Foreclosure
- [ ] 230 Rent Lease & Ejectment
- [ ] 240 Torts to Land
- [ ] 245 Tort Product Liability
- [ ] 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- [ ] 310 Airplane
- [ ] 315 Airplane Product Liability
- [ ] 320 Assault, Libel & Slander
- [ ] 330 Federal Employers' Liability
- [ ] 340 Marine
- [ ] 345 Marine Product Liability
- [ ] 350 Motor Vehicle
- [ ] 355 Motor Vehicle Product Liability
- [ ] 360 Other Personal Injury
- [ ] 362 Personal Injury - Medical Malpractice

PERSONAL INJURY
- [ ] 365 Personal Injury - Product Liability
- [ ] 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- [ ] 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- [ ] 370 Other Fraud
- [ ] 371 Truth in Lending
- [ ] 380 Other Personal Property Damage
- [ ] 385 Property Damage Product Liability

**CIVIL RIGHTS**
- [ ] 440 Other Civil Rights
- [ ] 441 Voting
- [ ] 442 Employment
- [ ] 443 Housing/ Accommodations
- [ ] 445 Amer. w/Disabilities - Employment
- [ ] 446 Amer. w/Disabilities - Other
- [ ] 448 Education

**PRISONER PETITIONS**

Habeas Corpus:
- [ ] 463 Alien Detainee
- [ ] 510 Motions to Vacate Sentence
- [ ] 530 General
- [ ] 535 Death Penalty

Other:
- [ ] 540 Mandamus & Other
- [ ] 550 Civil Rights
- [ ] 555 Prison Condition
- [ ] 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- [ ] 625 Drug Related Seizure of Property 21 USC 881
- [ ] 690 Other

**LABOR**
- [ ] 710 Fair Labor Standards Act
- [ ] 720 Labor/Management Relations
- [ ] 740 Railway Labor Act
- [ ] 751 Family and Medical Leave Act
- [ ] 790 Other Labor Litigation
- [ ] 791 Employee Retirement Income Security Act

**IMMIGRATION**
- [ ] 462 Naturalization Application
- [ ] 465 Other Immigration Actions

**BANKRUPTCY**
- [ ] 422 Appeal 28 USC 158
- [ ] 423 Withdrawal 28 USC 157

**INTELLECTUAL PROPERTY RIGHTS**
- [ ] 820 Copyrights
- [ ] 830 Patent
- [ ] 835 Patent - Abbreviated New Drug Application
- [ ] 840 Trademark
- [ ] 880 Defend Trade Secrets Act of 2016

**SOCIAL SECURITY**
- [ ] 861 HIA (1395ff)
- [ ] 862 Black Lung (923)
- [ ] 863 DIWC/DIWW (405(g))
- [ ] 864 SSID Title XVI
- [ ] 865 RSI (405(g))

**FEDERAL TAX SUITS**
- [ ] 870 Taxes (U.S. Plaintiff or Defendant)
- [ ] 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- [ ] 375 False Claims Act
- [ ] 376 Qui Tam (31 USC 3729(a))
- [ ] 400 State Reapportionment
- [x] 410 Antitrust
- [ ] 430 Banks and Banking
- [ ] 450 Commerce
- [ ] 460 Deportation
- [ ] 470 Racketeer Influenced and Corrupt Organizations
- [ ] 480 Consumer Credit (15 USC 1681 or 1692)
- [ ] 485 Telephone Consumer Protection Act
- [ ] 490 Cable/Sat TV
- [ ] 850 Securities/Commodities/ Exchange
- [ ] 890 Other Statutory Actions
- [ ] 891 Agricultural Acts
- [ ] 893 Environmental Matters
- [ ] 895 Freedom of Information Act
- [ ] 896 Arbitration
- [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- [ ] 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. Section 1 (Sherman Act)

Brief description of cause:
Antitrust challenge to NCAA eligibility and transfer restraints.

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ Injunctive relief

CHECK YES only if demanded in complaint:
JURY DEMAND: [ ] Yes [x] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE ____________ DOCKET NUMBER ____________

DATE: Aug. 17th 2026

SIGNATURE OF ATTORNEY OF RECORD

FOR OFFICE USE ONLY

RECEIPT # ________ AMOUNT ________ APPLYING IFP ________ JUDGE ________ MAG. JUDGE ________

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Iowa
Central Division

| | | |
|---|---|---|
| Jenna James<br>*Plaintiff(s)*<br>v.<br>National Collegiate Athletic Association<br>*Defendant(s)* | ) | Civil Action No. |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

National Collegiate Athletic Association
700 West Washington Street
Indianapolis, Indiana 46204

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Jenna James, Plaintiff pro se
Unit 102, 225 Veterans Drive
Brampton, Canada

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: ____________________

____________________________
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12) Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))***

This summons for *(name of individual and title, if any)* ______________________________
was received by me on *(date)* ________________ .

☐ I personally served the summons on the individual at *(place)* ______________________
______________________________ on *(date)* ______________ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* ______________
______________________ , a person of suitable age and discretion who resides there,
on *(date)* ______________ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* ______________________________ , who is
designated by law to accept service of process on behalf of *(name of organization)* ______________
______________________________ on *(date)* ______________ ; or

☐ I returned the summons unexecuted because ______________________________ ; or

☐ Other *(specify)*:

My fees are $ __________ for travel and $ __________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ______________

______________________________
*Server's signature*

______________________________
*Printed name and title*

______________________________
*Server's address*

Additional information regarding attempted service, etc: